UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALDWIN ACADEMY, INC. and PERICO HOLDINGS USA, LLC,<br><br>                              Plaintiffs,<br><br>v.<br><br>MARKEL INSURANCE COMPANY and DOES 1 through 10, inclusive,<br><br>                              Defendants. | Case No.: 3:20-cv-02004-H-AGS<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Doc. No. 40.]<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 41.] |

On October 4, 2021, Plaintiffs Baldwin Academy, Inc. and Perico Holdings USA, LLC ("Plaintiffs") filed a motion for partial summary judgment, (Doc. No. 40), and Defendant Markel Insurance Company ("Defendant") filed a motion for summary judgment. (Doc. No. 41.) On November 1, 2021, the parties filed their responses. (Doc. Nos. 42, 43.) On November 8, 2021, the parties filed their replies. (Doc. Nos. 46, 47.) On

December 6, 2021, the Court held a hearing on the motions. Laleaque Grad appeared on behalf of Plaintiffs. (Doc. No. 49.) Bennett Evan Cooper appeared on behalf of Defendant. (Id.) For the following reasons, the Court denies Plaintiffs' motion for partial summary judgment and grants Defendant's motion for summary judgment.

## Background

This action involves an insurance dispute between Plaintiffs and Defendant. Plaintiff Baldwin Academy ("Baldwin") is a preschool in the Pacific Beach community of San Diego County, California. (Doc. No. 40-1 at 1.) Defendant issued an insurance policy, Policy No. CCP20038076-02 (the "Policy"), to Baldwin for the policy period of June 12, 2019 to June 12, 2020. (Id. at 3, SUF 5, Ex. A.) In early March 2020, San Diego County reported its first confirmed positive cases of COVID-19. (Doc. No. 40-1 at 5–6, SUF 24.) As of Friday, March 13, 2020, Baldwin was not aware of any cases of COVID-19 among anyone who had visited Baldwin's campus. (Doc. No. 40-1 at 6, SUF 25.) That same day, Baldwin staff notified parents that it would remain open for the week commencing Monday, March 16, 2020. (Doc. No. 40-1 at 6, SUF 27.) On Saturday, March 14, 2020, the parent of one of Baldwin's students notified Baldwin staff by email that she and the student's grandfather had tested positive for COVID-19. (Doc. No. 40-1 at 6, SUF 28.) The infected parent and other members of the same household had allegedly dropped off and picked up the student at Baldwin's campus several times during the preceding two weeks. (Doc. No. 40-1 at 7; SUF 35, 37; Ex. Q.) The following day, on Sunday, March 15, 2020, Baldwin staff notified its families by email that Baldwin would be closed until the morning of Sunday, March 29, 2020. (Doc. No. 40-1 at 8, SUF 34.) During the week commencing Monday, March 16, 2020, state and local government agencies issued several orders and guidelines related to the COVID-19 pandemic. (Doc. No. 40-1 at 8–9; SUF 40–44; Ex. S, T, U, V, W, X, Y, OO.) Baldwin remained closed from March 16, 2020 through July 1, 2020. (SUF 68.)

On March 16, 2020, Baldwin initiated a business income loss claim under the Policy with Defendant. (Doc. No. 40-1 at 10, SUF 51.) On April 20, 2020, Defendant denied

1  Baldwin's claim. (Doc. No. 40-1 at 12, SUF 60.) Baldwin appealed the denial three times,
2  and Defendant reaffirmed its denial each time. (Doc. No. 40-1 at 12, SUF 61–67.) On
3  September 9, 2020, Plaintiffs filed a complaint against Defendant in California state court
4  for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing,
5  and (3) declaratory relief. (Doc. No. 1-3, Ex. 2, Compl.) On October 13, 2020, Defendant
6  removed the action to federal court on the basis of diversity jurisdiction. (Doc. No. 1.) On
7  October 23, 2020, Defendant filed a motion to dismiss Plaintiffs' compliant pursuant to
8  Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 7.) On December 21, 2020, the Court
9  denied Defendant's motion to dismiss. (Doc. No. 16.) By the present motions, Plaintiffs
10 move for partial summary judgment and Defendant moves for summary judgment pursuant
11 to Federal Rule of Civil Procedure 56. (Doc. Nos. 40, 41.)

**Discussion**

**I.    Legal Standards**

    A.    Motion for Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord Anderson, 477 U.S. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party

1  can satisfy this burden in two ways: (1) by presenting evidence that negates an essential
2  element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party
3  failed to establish an essential element of the nonmoving party's case that the nonmoving
4  party bears the burden of proving at trial. Id. at 322–23; Jones v. Williams, 791 F.3d 1023,
5  1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of
6  material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as
7  otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for
8  trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord
9  Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007).  To carry this
10 burden, the nonmoving party "may not rest upon mere allegation or denials of his
11 pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309
12 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings.").
13 Rather, the nonmoving party "must present affirmative evidence . . . from which a jury
14 might return a verdict in his favor." Anderson, 477 U.S. at 256.

15 When ruling on a summary judgment motion, the court must view the facts and draw
16 all reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris,
17 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility
18 determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be
19 believed." Id. Further, the Court may consider other materials in the record not cited to by
20 the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo
21 Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

22       B.    California Insurance Contract Interpretation

23 Since federal jurisdiction in this action is based on diversity of citizenship, the
24 substantive law of California governs the interpretation of insurance policy provisions.
25 Stanford Univ. Hosp. v. Fed. Ins. Co., 174 F.3d 1077, 1083 (9th Cir. 1999); Humboldt
26 Bank v. Gulf Ins. Co., 323 F. Supp. 2d 1027, 1032 (N.D. Cal. June 3, 2004). Interpretation
27 of an insurance policy is a question of law for the court. Powerine Oil Co., Inc. v. Superior
28 Court, 118 P.3d 589, 597 (Cal. 2005). Such interpretation must give effect to "the mutual

intention of the parties at the time the contract is formed . . . ." Id. To determine the intent of the parties behind an insurance contract, the court "look[s] first to the language of the contract in order to ascertain its plain meaning," reading the language in its "ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." Id. (internal citations and quotation marks omitted). "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." Id. (citing Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Ins. Co., 855 P.2d 1263, 1271 (Cal. 1993)). Language in an insurance contract "must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." Id.

"Insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured." MacKinnon v. Truck Ins. Exch., 73 P.3d 1205, 1213 (Cal. 2003) (citations omitted). When there is ambiguity in an insurance policy, the policy's exclusions and exceptions are strictly construed against the insurer and liberally interpreted in favor of the insured in order to protect the insured's reasonable expectation of coverage. La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co., 884 P.2d 1048, 1053 (Cal. 1994); see also Delgado v. Heritage Life Ins. Co., 203 Cal. Rptr. 672, 677 (Ct. App. 1984). Any limitation of coverage must be "stated precisely and understandably, in words that are part of the working vocabulary of the average layperson." Haynes v. Farmers Ins. Exch., 89 P.3d 381, 385 (Cal. 2004). Furthermore, the burden is on the insurer to "phrase exceptions and exclusions in clear and unmistakable language." MacKinnon, 73 P.3d at 1213 (quoting State Farm Mut. Auto. Ins. Co. v. Jacober, 514 P.2d 953, 957–58 (Cal. 1973)). But "[a]n insurance company can choose which risks it will insure and which it will not, and coverage limitations set forth in a policy will be respected." Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co., 78 Cal. Rptr. 2d 429, 432 (Ct. App. 1998) (citing Legarra v. Federated Mutual Ins. Co., 42 Cal. Rptr. 2d 101, 105 (Ct. App. 1995)).

The insured bears the burden of establishing that a claim is within the basic scope of coverage. MacKinnon, 73 P.3d at 1213. But the burden is on the insurer to establish that

the claim is specifically excluded. Id. (citing Aydin Corp. v. First State Ins. Co., 959 P.2d 1213, 1215 (Cal. 1998)).

## II. Breach of Contract Analysis

Both parties move for summary judgment on Plaintiffs' breach of contract claim. (Doc. Nos. 40-1 at 2; 41-1 at 1.) Plaintiffs allege Defendant breached its contractual obligations under the Policy by denying Baldwin's loss of business income claim. (Doc. No. 1-3, Ex. 2, Compl. ¶¶ 33–37.) The parties' arguments center on whether the Policy's "California Business Income Changes – Communicable Disease and Food Contamination" Endorsement (the "CA-CDE") provides coverage for Baldwin's claim.[1] Section A.1 of the CA-CDE provides:

> We will pay for the actual loss of Business Income you sustain as a result of a temporary shutdown or "suspension of your entire "operations" at your described premise during the "period of restoration." The shutdown or "suspension" of your "operations" must be the result of an order or recommendation from a local, state or federal Board of Health or any other governmental authority having jurisdiction over your "operations". Such shutdown or "suspension" must be caused by or result from a Covered Cause of Loss as described in Paragraph 3. Below.

(Doc. No. 40-8, Ex. A at 124.) Section A.3 of the CA-CDE provides:

> A Covered Cause of Loss is an outbreak at premises described in the Declarations, of a "Communicable Disease" such as, but not limited to, meningitis, measles or Legionnaire's disease…

(Id. at 125.) The Section F.1.3 of the CA-CDE defines "period of restoration" as:

> [T]he period of time that…(a) [b]egins the number of hours shown in the Schedule of this endorsement after the shutdown or "suspension" of your "operations" by a jurisdictional Board of Health or any other government authority and your premises are evacuated caused by or resulting from a Covered Cause of Loss at the described premises; and…(b) [e]nds on the earlier of …(1) [t]he day before your "operations resume, either fully or partially; or…(2) [t]he day the jurisdictional

---

[1] The Policy contains three provisions related to communicable diseases: (1) the CA-CDE, (2) a second general communicable disease endorsement, "Business Income Changes – Communicable Disease and Food Contamination Extension," (Doc. No. 40-8, Ex. C), and (3) a virus exclusion exemption, "Exclusion for Loss Due to Virus or Bacteria." (Doc. No. 40-8, Ex. D.) The parties agree Baldwin's claim should be analyzed under the CA-CDE and that neither the second general communicable disease endorsement nor the virus exclusion exemption apply to Baldwin's claim. (Doc. Nos. 40-1 at 14; 43 at 1.)

Board of Health or any other governmental authority certifies that your premise are habitable and may reopen as fully or partially operational.

(Id.) The CA-CDE Schedule provides that the "period of restoration" begins after 72 hours. (Id. at 124.)

Defendant argues the CA-CDE requires three conditions for coverage: (1) that Baldwin's closure be "the result of an order or recommendation from…a governmental authority," (2) that there is an "outbreak" at Baldwin's insured premise, and (3) that any governmental orders or recommendations were "caused by" or "result from" something that happened at Baldwin's premise. (Doc. No. 41-1 at 6–7.) Defendant argues Baldwin's loss of business income claim does not satisfy any of the CA-CDE's three conditions necessary for coverage and so the Court should grant summary judgment for Defendant. (Id. at 6.)

Plaintiffs argue the CA-CDE only requires two conditions for coverage: "(1) the shutdown or 'suspension' of [Baldwin's operations] must be the result of a government recommendation or order; and (2) the shutdown or 'suspension' of [Baldwin's operations] be 'caused by or result from' a Covered Cause of Loss (i.e. outbreak at the premise)." (Doc. No. 42 at 15.) Plaintiffs argue Baldwin's claim satisfies both conditions necessary for coverage and so the Court should grant summary judgment for Plaintiffs. (Doc. No. 40-1 at 14.) The Court next addresses each condition under the CA-CDE in turn.

A. <u>Was there a shutdown or suspension of Baldwin's entire operations as a result of an order or recommendation from a government authority?</u>

Plaintiffs argue that the first two sentences of Section A.1 of the CA-CDE do not impose "a specific timing element stating the recommendation or order must pre-date Baldwin's closure." (Doc. No. 40-1 at 20.) As a result, Plaintiffs argue the CA-CDE covers Baldwin's claim even though Baldwin closed on Sunday, March 15, 2020 and the government orders and recommendations cited by Plaintiffs as affirming Baldwin's need to closed were issued beginning the next day, Monday, March 16, 2020. (Id.) Defendant argues the phrase "the result of" in the second sentence of Section A.1 of the CA-CDE

does impose a temporal requirement. (Doc. No. 43 at 6.) Defendant argues "Baldwin closed its facilities before it received any government order or recommendation," and instead voluntarily closed as a precautionary measure in response to a parent's email reporting her positive COVID-19 test. (Doc. 41-1 at 8–9.) Defendant argues the necessary "causal link" between Baldwin's closure and the government orders cited by Plaintiffs cannot exist "where the purported cause occurred after the supposed result," and so the CA-CDE does not cover Baldwin's claim (Doc. No. 43 at 5–6.)

In construing insurance contracts, the goal is "to give effect to the parties' mutual intentions." Minkler v. Safeco Inc., 232 P.3d 612, 617 (Cal. 2010) (citing Bank of the West v. Superior Court, 833 P.2d 545, 552 (Cal. 1992)). "To determine the intent of the parties, courts 'look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it,' reading the language in its 'ordinary and popular sense.'" See In re United Specialty Ins. Co. Ski Pass Ins. Litig., 2021 WL 4974981, at *3 (N.D. Cal. Oct. 26, 2021) (quoting Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (1995)).

The second sentence of Section A.1 of the CA-CDE provides that:

> The shutdown or 'suspension' of your 'operations' must be the result of an order or recommendation from a local state or federal Board of Health or any other governmental authority having jurisdiction over your 'operations'.

(Doc. No. 40-8, Ex. A at 124.) The Court agrees with Defendant that the plain meaning of the phrase "the result of" imposes a causal requirement between the issuance of an order or recommendation from a government authority and Baldwin's closure. See Burrage v. United States, 571 U.S. 204, 210–11 (2014) (holding the phrase "'results from' imposes…a requirement of actual causality"). Baldwin's closure must have been in response to a government order or recommendation that predated Baldwin's decision to close for coverage under the CA-CDE.

On Friday, March 13, 2020, Baldwin staff notified its families by email that Baldwin would remain open during the week of Monday, March 16, 2020. (Doc. No. 47-

1, SUF 27.) On Saturday, March 14, 2020, Baldwin received an email from a parent of one of its students notifying Baldwin that the parent had tested positive for COVID-19. (Doc. No. 47-1, SUF 28.) On Sunday, March 15, 2020, Baldwin staff notified its families Baldwin would close starting that day and remain closed until Sunday, March 29, 2020. (Doc. No. 47-1, SUF 34.) The parties agree that there was no government orders or recommendations issued between March 13, 2020 and March 15, 2020 that caused Baldwin to alter its decision to closed. (Doc. Nos. 40-1 at 20–21; 41-1 at 9.) The only government order or recommendation cited by Baldwin that predates Baldwin's closure on March 15, 2020 is an order by the San Diego County Health officer dated March 12, 2020. (Doc. No. 40-9 at 54, Ex. S.) The order banned "large gatherings" of over 250 people. (Id.) As of March 2020, Plaintiff had approximately 86 students and 20 staff, and so Baldwin did not fall under the "large gathering definition." (Doc. No. 40-1 at 2; SUF 2.) As a result, Baldwin's closure on Sunday, March 15, 2020 was not the "the result of an order or recommendation from a local state or federal Board of Health or any other governmental authority."

      B.    <u>Was there an outbreak of a communicable disease at Baldwin's premise?</u>

The parties agree that COVID-19 is a "Communicable Disease" under the CA-CDE. (Doc. Nos. 40-1 at 15; 40-1 at 15.) The Policy defines "premise" as Baldwin's four buildings at 1752, 1760, 1762, and 1772 Hornblend St., San Diego, CA 92109. (Doc. No. 40-8, Ex. A at 35.) The parties primary dispute centers around the meaning of the phrase "outbreak, at premise" in the third line of Section 1.A of the CA-CDE.

Plaintiffs, citing Merriam-Webster's Dictionary, argue that the plain and ordinary meaning of "outbreak" is "a sudden rise in the incidence of a disease." (Doc. No. 40-1 at 15.) Under this definition, Plaintiffs argue "outbreak, at premise" only requires there to be "one case of a communicable disease in an individual present on the premise." (Doc. No. 42 at 19.) Plaintiffs argue that prior to March 14, 2020, there were zero known cases of COVID-19 at Baldwin's premise (Doc. No. 40-1 at 15.) Plaintiffs argue on and after March 14, 2020, Baldwin learned there had been several cases of COVID-19 at

Baldwin's premise and the surrounding community. (Id.) Plaintiffs argue this rise in cases constitutes an "outbreak, at premise" sufficient for coverage under the CA-CDE. (Id.)

Defendant argues for a narrower definition of "outbreak, at premise." (Doc. No. 43 at 16–19.) First, Defendant argues that "outbreak, at premise" requires "a cluster from which transmission 'at' the location may be inferred." (Doc. No. 41-1 at 16.) Second, Defendant argues that "outbreak, at premise" requires that a Baldwin child, teacher, or staff member was infected at Baldwin's premise. (Id.) Under this definition, Defendant argues that a "single case of a visitor to a location" is not an "outbreak, at premise." (Id. at 15–16.)

The term "outbreak" is not defined anywhere in the Policy. But the absence of a definition of a term in an insurance policy "does not by itself render the term ambiguous." Bay Cities Paving & Graving, 855 P.2d at 1270. The court must interpret terms in an insurance policy in accordance with the term's "plain meaning or the meaning a layperson would ordinarily attach to it." See In re United Specialty Ins. Co. Ski Pass Ins. Litig., 2021 WL 4974981, at *3 (quoting Waller, 11 Cal. 4th at 18). "In seeking to ascertain the ordinary sense of words [in an insurance policy], courts in insurance cases regularly turn to general dictionaries." Scott v. Cont'l Ins. Co., 44 Cal. App. 4th 24, 29 (1996); see also Northrop Grumman Corp. v. Factory Mut. Ins. Co., 563 F.3d 777, 784 n.4 (9th Cir. 2009). Statutory or regulatory definitions may also provide the common usages of words. See AIU Ins. Co. v. Superior Court, 799 P.2d 1253, 1267 (Cal. 1990) (citing a California statute for the plain and ordinary meaning of a term in an insurance policy); see also H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2020), ¶ 4:80 ("Statutes may provide the common usage of words used in an insurance policy.") But the "examination of various dictionary definitions of a word…does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context." MacKinnon v. Truck Ins. Exch., 73 P.3d 1205, 1214 (Cal. 2003).

In support of Defendant's interpretation, Defendant cite California Code of Regulations, Title 22, section 101212, which includes reporting requirements for California licensed childcare facilities. Section 101212(d)(1)(E) requires licensed childcare facilities to report to the state "epidemic outbreaks" that occur "during the operation of the childcare center." Cal. Code Regs. Tit. 22, § 101212(d)(1)(E). Section 101212(d)(2) requires childcare facilities to provide a written report to the state in the case of a "epidemic outbreak" with the "child's name, age, sex and date of admission." Id. § 101212(d)(2). Section 101212(g)(1) requires licensed childcare facilities to report to the local health officer outbreaks or suspected outbreaks involving "two or more children of any communicable disease." Id. § 101212(d)(2) California Code of Regulations, Title 7, section 2500(a)(2), which is cross referenced, defines "outbreak" as:

> [T] occurrence of cases of a disease (illness) above the expected or baseline level, usually over a given period of time, in a geographic area or facility, or in a specific population group….. A single case of a communicable disease long absent from a population or the first invasion by a disease not previously recognized may constitute an outbreak and require immediate reporting and epidemiologic investigation.

Cal. Code Regs. Tit. 17, §2500(a)(2).

California Code of Regulations, Title 22, section 101212(d)(1)(E) and Tile 17, section §2500 (a)(22) were first enacted in 2004. The CA-CDE was first included Baldwin's Policy with Defendant in 2008. (Doc. No. 47-1, SUF 15, Perico Decl. at ¶ 15.) Because Baldwin is a California licensed childcare facility and the CA-CDE is related to communicable disease outbreaks at Baldwin, how the government agency regulating Baldwin defines "outbreak" is relevant in interpreting the term's ordinary usage in the Policy. In the context of California licensed childcare facilities, the phrase "outbreak, at premise" requires that an individual such as a student, teacher, or staff member on Baldwin's premise have a case of a communicable disease, rather than just a short-term visitor that later test positive.

The only alleged confirmed case of COVID-19 on Baldwin's premise was a parent that have been on Baldwin's campus twice to drop off her child the week prior to testing

positive. (Doc. No. 47-1, SUF 28.) Under the CA-CDE, this does not constitute an outbreak at Baldwin's premise. As a result, Defendant has met its burden of showing there is no genuine issue of material fact remaining and that it is entitled to judgment as a matter of law on Plaintiffs' breach of contract claim.[2] The Court grants Defendant's motion for summary judgment on Plaintiffs' breach of contract claim.

### III. Breach of Covenant of Good Faith and Fair Dealing Analysis

Defendant also seeks summary judgment on Plaintiffs' breach of the covenant of good faith and fair dealing claim. (Doc. No. 41-1 at 20–21.) Under California law, a breach of covenant of food faith and fair dealing claim requires proving two elements: "(1) benefits under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." Mudpie, Inc. v. Travelers Casualty Ins. Co. of America, 15 F.4th 885, 893 n.6 (9th Cir. 2021) (quoting Love v. Fire Ins. Exchange, 221 Cal. App. 3d 1136, 1151 (1990)). Plaintiff is not entitled to coverage under the Policy, and so the first element has not been met. As a result, the Court grants Defendant's motion for summary judgment on Plaintiffs' breach of the covenant of good faith and fair dealing claim.

### Conclusion

For the reasons stated above, the Court denies Plaintiffs' motion for partial summary judgment and grants Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

DATED: December 17, 2021

*[signature]*
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[2] The parties also dispute whether the CA-CDE imposes a third condition for coverage that "an order or recommendation to suspend operations result[] from what occurred on Baldwin's premise." (Doc. Nos. 42 at 14; 46 at 5.) Plaintiff is not entitled to coverage under the CA-CDE because its claim does not meet the other two conditions the parties agree are required by the CA-CDE for coverage. As a result, the Court declines to address whether this third condition is also required for coverage under the CA-CDE.